## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CONGRESS SQUARE LIMITED PARTNERSHIP** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 10-317** |
| | * | |
| **ERNEST B. POLK** | * | **SECTION "L" (1)** |

### ORDER & REASONS

Before the Court is a Motion for Partial Summary Judgment as to Attorney's Fees (Rec. Doc. No. 44) filed by Congress Square Limited Partnership, a Motion for Partial Summary Judgment as to Malicious Prosecution (Rec. Doc. No. 48) filed by Congress Square, and a Motion for Summary Judgment (Rec. Doc. No. 51) filed by Tiffany Peters. The Court, having reviewed the submitted memoranda and the applicable law and having heard oral arguments on the motions, is ready to rule. For the following reasons, the motions are granted.

## I. BACKGROUND

This case arises out of a dispute between Congress Square Limited Partnership and Ernest Polk regarding a "managerial consultant agreement" between the two parties. Congress Square is a limited partnership between Velocity Foundation as general partner and Capital One as limited partner. It owns a 32-unit residential apartment complex located at 1401-1423 Congress Street and 1400-1438 Independence Street in New Orleans. In November 2006, Congress Square and Mr. Polk entered into an agreement under which Mr. Polk was to perform certain management obligations for a term of five years in consideration of a fee of $3,500 per month. The events that transpired after the parties entered into the agreement are subjects of

1

divergent accounts.

Congress Square alleges in its Complaint that in late 2009, after recovering from serious health problems, the executive director of Velocity Foundation, Julius Wilkerson, discovered that Mr. Polk "had failed to perform all of his obligations" under the agreement, such as ensuring that repairs be made to the property. Congress Square avers that it notified Mr. Polk of his defaults by letter dated September 28, 2009 and October 5, 2009. It claims that after Mr. Polk refused to perform his obligations, it terminated the managerial consultant agreement.

Mr. Polk disputes these allegations. He asserts that he successfully managed the apartment complex, allowing it to turn a profit under his oversight. According to Mr. Polk, the relationship between him and Congress Square deteriorated when Mr. Wilkerson asked him to employ Mr. Wilkerson's son for a repair project at the apartment complex. Mr. Polk alleges that after he reviewed the qualifications and cost estimates of Mr. Wilkerson's son and compared them with those of other contractors, he informed Mr. Wilkerson that he would not hire Mr. Wilkerson's son. Mr. Polk asserts that after this decision, Mr. Wilkerson made concerted efforts to "get rid" of him, including by letters dated September 28, 2009 and October 5, 2009, in violation of the terms of the agreement.

Mr. Polk alleges that on October 21, 2009, he went to the apartment complex for an inspection of the property. Mr. Polk avers that when he went to see if he could meet with Mr. Wilkerson, he was handed a letter dated October 16, 2009 and written by Tiffany Peters -- an attorney -- advising him that the agreement with him was terminated. Mr. Polk alleges that he had not previously seen that letter and that he had given notice to Mr. Wilkerson that he would be at the property for the inspection. According to Mr. Polk, after the inspection was completed,

2

he was standing on the sidewalk when a police officer, Cinnamon Rochon, came by and arrested him. Mr. Polk alleges that Mr. Wilkerson arrived on the scene and told the police officer that he had asked Mr. Polk to leave and that Mr. Polk had refused to do so. According to Mr. Polk, Ms. Peters had previously advised Mr. Wilkerson to call the police. Mr. Polk avers that he was jailed and arraigned, but that the charge of criminal trespass against him was dropped shortly before trial.

In early 2010, Congress Square filed the instant suit against Mr. Polk. In its Complaint, Congress Square states that in light of Mr. Polk's alleged misrepresentations about his qualifications and his alleged failure to perform his obligations under the agreement, it seeks the rescission of the contract or, in the alternative, the reformation of the contract and damages for breach of contract. Congress Square also seeks a permanent injunction against Mr. Polk, one that enjoins him from entering the apartment complex and from taking any action on behalf of or on the account of Congress Square.[1]

In response, Mr. Polk has denied liability and filed a counterclaim against Congress Square. Mr. Polk claims, *inter alia*, that Congress Square has failed to pay an open account and is thereby liable for the amount due and for attorney's fees and that Congress Square is also liable for malicious prosecution. Mr. Polk has also impleaded Ms. Peters, among others, as third-party defendants. Mr. Polk asserts that Ms. Peters is liable to him for negligent infliction of emotional distress, intentional infliction of emotional distress, malicious prosecution, and

---

[1] In March 2010, Congress Square filed a motion for a preliminary injunction. Thereafter, the parties reached an agreement with regard to the scope of the injunction. Accordingly, the Court granted a joint motion filed by Congress Square and Mr. Polk and entered a preliminary injunction, enjoining Mr. Polk from entering the apartment complex and taking any action on behalf of or on the account of Congress Square. This injunction remains in force.

intentional interference with a contractual relationship. In her answer, Ms. Peters has denied liability.

## II.  PRESENT MOTIONS

Congress Square has filed two motions for partial summary judgment with respect to Mr. Polk's counterclaims, and Ms. Peters has filed a motion for summary judgment with respect to Mr. Polk's third-party claims.

### A. Congress Square's Motion for Partial Summary Judgment on Counterclaim for Attorney's Fees Under the Open Account Statute

In its first motion for partial summary judgment, Congress Square asserts that Mr. Polk is not entitled to recover attorney's fees under Louisiana's open account statute, La. Rev. Stat. Ann. § 9:2871. Congress Square notes that Louisiana jurisprudence has consistently distinguished between open accounts and ordinary contracts and that any amount that Mr. Polk alleges is due to him arises under a contract, not an open account. Congress Square also contends that any services rendered by Mr. Polk do not constitute "professional services" for which there may be an open account within the meaning of the statute. Mr. Polk opposes the motion. In his brief, Mr. Polk argues that any account that is an unpaid is an open account under that statute. In support of his contention, Mr. Polk cites to the Louisiana Supreme Court's decision in *Frey Plumbing Co., Inc. v. Foster*, 996 So.2d 969, 972 (La. 2008).

### B. Congress Square's Motion for Partial Summary Judgment on Counterclaim for Malicious Prosecution

In its second motion for partial summary judgment, Congress Square argues that Mr. Polk's claim of malicious prosecution fails as a matter of law. Congress Square contends that Mr.

Polk cannot prove five of the six elements that are essential to the tort claim of malicious prosecution under Louisiana law. *See generally Jones v. Soileau*, 448 So.2d 1268, 1271 (La. 1984) (identifying the six elements). Congress Square argues, for instance, that Mr. Polk cannot show that there was a "bona fide termination" of the criminal proceeding that underlies Mr. Polk's claim. *Id.* Mr. Polk also opposes this motion. He asserts that there is a genuine issue of material fact as to the elements of the tort.

### C. Ms. Peters's Motion for Summary Judgment on All Third-Party Claims

In her motion for summary judgment, Ms. Peters asserts that each of the claims asserted against her by Mr. Polk fail as a matter of law. Citing *Penalber v. Blount*, 550 So.2d 577 (La. 1989), Ms. Peters argues that an attorney who is alleged to have acted tortiously against a non-client, but only in her capacity as an attorney, cannot be sued for acts of negligence. Ms. Peters contends that Mr. Polk's claim of negligent infliction of emotional distress is thus without merit.

With respect to the remaining tort claims, all of which are intentional torts, Ms. Peters argues that they each are without merit for different reasons. As to Mr. Polk's claim of intentional infliction of emotional distress (IIED), Ms. Peters contends that the claim of IIED is unavailable because Mr. Polk could recover damages for emotional distress under his other tort claims. Ms. Peters also argues that Mr. Polk has not adduced evidence to establish the elements of the claim, including the element that she intended to inflict severe emotional distress upon him.

With respect to Mr. Polk's claim of malicious prosecution, Ms. Peters echoes the arguments advanced by Congress Square. She notes, for instance, that Mr. Polk cannot demonstrate that there was a "bona fide termination" of the criminal proceeding underlying his

claim. Finally, with respect to Mr. Polk's claim of intentional interference with a contract, Ms. Peters emphasizes that Mr. Polk cannot prove that she advised Mr. Wilkerson with an intent to harm Mr. Polk that was independent of her desire to advance the interests of her client.

Mr. Polk opposes in part Ms. Peters's motion. Mr. Polk concedes that Ms. Peters cannot be held for negligence and that his claim of negligent infliction of emotional distress fails. In addition, Mr. Polk accepts Ms. Peters's contention that his claim of IIED should be dismissed because he could recover damages for emotional distress under his separate tort claims. Mr. Polk, however, objects to Ms. Peters's argument that his claim of malicious prosecution and his claim of intentional interference with a contract fail. Mr. Polk asserts that there is a genuine issue of material fact as to all six elements of the tort of malicious prosecution. He also contends that Ms. Peters can be held liable for intentionally interfering with his contract. He asserts, without citing to any authority, that Louisiana law allows a third party to hold an attorney liable for advising a client to dissolve a contractual agreement between the third party and the client.

## III.  LAW AND ANALYSIS

### A. Standard of Review

A district court can grant a motion for summary judgment only when the "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). When considering a motion for summary judgment, the district court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986). The court must find "[a] factual dispute . . . [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party . . . [and a] fact . . . [to be]

'material' if it might affect the outcome of the suit under the governing substantive law." *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995). The mere argued existence of a factual dispute will not defeat an otherwise properly supported motion. *See Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at 249-50 (citations omitted).

**B. Mr. Polk's Counterclaim Against Congress Square Under the Open Account Statute**

Mr. Polk has asserted a counterclaim against Congress Square under Louisiana's open account statute, which provides for the recovery of attorney's fees in cases where a claimant sues another for failure to pay an open account. *See* La. Rev. Stat. Ann. § 9:2781(A). Congress Square argues that his claim for attorney's fees under this provision fails for two reasons: 1) any services that Mr. Polk might have rendered are not "professional services" within the meaning of the statue, and 2) any outstanding obligation that Congress Square might have to pay Mr. Polk arises under a contract, and not an open account.

Congress Square's first argument can easily be disposed of. The statute states that the term "'[o]pen account shall include debts incurred for professional services . . . ." *Id.* § 9:2781(D). As the Louisiana Supreme Court has observed, "[t]his language indicates [that] professional services are included within the ambit of an open account, but it is not mandatory

7

that professional services be rendered for an account to be considered an open account." *Frey Plumbing Co., Inc. v. Foster*, 996 So.2d 969, 972 (La. 2008). "Indicating [that] professional services are 'included' does not limit an open account to a professional service agreement." *Id.* Accordingly, whether the services that Mr. Polk is alleged to have rendered are "professional services" is immaterial to whether attorney's fees are recoverable. The critical issue here is whether any amount that might be due to Mr. Polk arises from an "open account" as contemplated by the statute.

The answer to this question is no. The Louisiana Supreme Court has cautioned that the open account statute must be construed "strictly . . . because the award of attorney fees is exceptional and penal in nature." *Frank L. Beier Radio, Inc. v. Black Gold Marine, Inc.*, 449 So.2d 1014, 1015 (La. 1984). With this principle in mind, the courts -- while acknowledging that an agreement necessarily underlies an open account -- have consistently drawn the distinction between open accounts and ordinary contracts. *See, e.g.*, *Signlite, Inc. v. Northshore Serv. Ctr.*, 959 So.2d 904, 907 (La. Ct. App. 1st Cir. 2007); *Shreveport Elec. Co., Inc. v. Oasis Pool Serv., Inc.*, 889 So.2d 274, 279 (La. Ct. App. 2d Cir. 2004); *Tyler v. Hanes*, 760 So.2d 559, 563 (La. Ct. App. 3d Cir. 2000); *Chehardy, Sherman, Ellis, Breslin & Murray v. Amerasia Co., Inc.*, 694 So.2d 355, 356-57 (La. Ct. App. 5th Cir. 1996); *Olinde v. Couvillion*, 650 So.2d 1241, 1242 (La. Ct. App. 4th Cir. 1995).

A contract is an agreement embodying "a concurrence in understanding [of] the terms." *Signlite*, 959 So.2d at 907; *Tyler*, 760 So.2d at 563. An open account, on the other hand, generally leaves undetermined key aspects of the obligation, such as the time period during which services will be rendered or the total cost of the services for which a party may be liable.

8

*See Mid-South Analytical Labs, Inc. v. Jones, Odom, Spruill & Davis, LLP*, 912 So.2d 101, 107 (La. Ct. App. 2d Cir. 2005) (noting that "open accounts ordinarily contemplate a series of transactions between the parties over an indefinite future period" and that "[t]he total cost . . . is generally left open or undetermined"). Thus, an open account, as its name indicates, is an account that is "open to future modification," *Tyler*, 760 So.2d at 563, one "that is left open for ongoing debit and credit entries . . . and that has a fluctuating balance until either party finds it convenient to settle and close, at which time there is a single liability," *Black's Law Dictionary* 20 (8th ed. 2004) (defining "open account"). "An open account has been compared to a credit account," and a line of credit is an indicium of an open account. *Tyler*, 760 So.2d at 562.

Here, the "managerial consultant agreement" lacks the indeterminate nature of an open account. The agreement, memorialized in writing, specifies the payment of $3,500 per month "in consideration" of Mr. Polk's agreement to perform various tasks. Pl.'s Ex. A (Rec. Doc. No. 44-3). The agreement has a definite term of five years beginning on December 1, 2006, one that is renewable with the consent of both parties. *Id.* The only invoice proffered by Mr. Polk to show that payment is due to him, one that is dated December 30, 2009, indicates that the payment of $3,500 per month is due upon receipt of each invoice. *See* Def.'s Ex. N (Rec. Doc. No. 54-1). Altogether, then, the arrangement at issue was for payments at fixed intervals of a fixed sum for a fixed set of services to be rendered over a fixed number of years. In light of this, it appears clear that the agreement "do[es] not point to an account open to future modification, but rather [shows] a contractual agreement" for the provision of services, one that embodies "a concurrence in understanding of specific terms." *Ormet Primary Aluminum Corp. v. Ballast Techs., Inc.*, No. 09-6726, 2010 WL 2671814, at *4 (E.D. La. 2010) (quoting *Constr. Testing Labs, Inc. v. Wal-*

*Mart Stores, Inc.*, No. 08-569, 2009 WL 2214678, at *3 (W.D. La. 2009)).

In his opposition, Mr. Polk draws attention to La. Rev. Stat. Ann. § 9:2781(D), which states that the term "'open account' includes any account for which a part or all of the balance is past due, whether or not the account reflects one or more transactions and whether or not at the time of contracting the parties expected future transactions." Mr. Polk argues that the phrase "any account for which a part or all of the balance is past due" has no express limitation. He also finds it significant that in *Frey Plumbing*, the Louisiana Supreme Court described that provision as "clear and unambiguous." 996 So.2d at 972. Mr. Polk thus appears to argue that any account that is unpaid is an open account under the open account statute. A close reading of *Frey Plumbing* suggests that this argument is unsound.

The Louisiana Supreme Court's comment that the aforementioned provision is "clear and unambiguous" cannot be understood without taking into account the question that the court sought to answer in *Frey Plumbing*. In that case, the lowers courts concluded that "a contract for open account could not exist between the parties . . . because there was only a single transaction between them and no future transactions were contemplated." *Id.* In explaining why this was incorrect, the Louisiana Supreme Court cited to La. Rev. Stat. Ann. § 9:2781(D). *See Frey Plumbing*, 996 So.2d at 972. The court's comment that this provision is "clear and unambiguous" was thus made in reference to the statute's express provision that "whether or not the account reflects one or more transactions and whether or not at the time of contracting the parties expected future transactions" are not determinative of whether an open account exists. *Id.* (quoting La. Rev. Stat. Ann. § 9:2781(D)). The court did not suggest in any way that obligations to pay under ordinary contracts and obligations to pay under open accounts are one and the

same.[2]

Had it done so, it would have been dictum, *see Wise v. Bossier Parish Sch. Bd.*, 851 So.2d 1090, 1095 n.6 (La. 2003) ("An expression in an opinion not necessary for the decision is merely 'obiter dictum.'"), and therefore "not binding," *Boyd v. Wackenhut Corp.*, 993 So.2d 216, 216 (La. 2008). More importantly, such a conclusion would have been difficult to reconcile with various statutory provisions that underscore a distinction between open accounts and ordinary contracts. For instance, by statute, the prescriptive periods for actions on open accounts and on contracts for compensation for services, though the same, are delineated separately. *Compare* La. Civ. Code Ann. art. 3494(4) (open accounts) *with id.* art. 3494(1) (recovery of compensation for services rendered).[3] "The law has [thus] historically treated an open account unlike a contract," *Operational Techs. Corp. v. Env't. Contractors, Inc.*, 665 So.2d 14, 15-16 (La. Ct. App. 1st Cir. 1995), and "[a] claim for breach of contract and a claim under the open account statute are considered distinct causes of action," *Cambridge Toxicology Group, Inc. v. Exnicios*, 495 F.3d 169, 174 (5th Cir. 2007).

Mr. Polk's argument that any account that is unpaid is an open account under Section

---

[2] "The open account statute was amended in 1983 . . . to allow professionals that rendered a one-time service . . . to recover payment." *Mid-South*, 912 So.2d at 106. Prior to the amendment, "the statute failed to address the situation where professional services were rendered in a single transaction." *Id.* The language in Section 9:2781(D) thus appears to reflect the Legislature's attempt at ensuring that professionals who render a service on a one-time basis, but who cannot beforehand determine the precise scope of the service to be rendered or the specific time that it would take to render the service, to recover under the open account statute. In light of this, it is implausible to read that provision as stating that any account is an open account.

[3] Under Louisiana law, the venue requirements for actions on open accounts and actions on contracts are also governed separately -- by Article 42 and Article 76.1 of the Louisiana Code of Civil Procedure, respectively. *See, e.g.*, *Amerasia*, 694 So.2d at 357; *Olinde*, 650 So.2d at 1242-43.

9:2871 is therefore unpersuasive because it fails to take into account the fact that an obligation to pay under an ordinary contract has long been considered to be different from an obligation to pay under an open account. And it fails to give effect to the prevailing meaning of the term "open account." As noted above, the arrangement between Mr. Polk and Congress Square lacks the indeterminacy that is characteristic of an open account. Instead, it defines the scope of the services to be performed by Mr. Polk and delineates in every single respect the obligation of Congress Square to pay Mr. Polk for those services. Accordingly, it appears that the agreement between the two parties constitutes an ordinary contract for services, for which a claim for attorney's fees may not be had under the open account statute. Congress Square's motion for partial summary judgment as to this claim must therefore be granted.

## C. Mr. Polk's Counterclaim Against Congress Square for Malicious Prosecution

Mr. Polk has asserted a counterclaim against Congress Square, alleging that Congress Square, through the action of Mr. Wilkerson, engaged in malicious prosecution. As noted above, Mr. Polk alleges that on October 21, 2009, he went to the apartment complex to perform an inspection. According to Mr. Polk, after he finished the inspection, he was arrested for criminal trespass. Mr. Polk alleges that Mr. Wilkerson told the police officer that Mr. Polk had refused to leave the property after being told to do so. Congress Square has now moved for summary judgment on this claim.

The Louisiana Supreme Court has recognized the tort of malicious prosecution as actionable under Article 2315 of the Civil Code, *see, e.g.*, *Jones v. Soileau*, 448 So.2d 1268, 1271 (La. 1984), but it has cautioned that this cause of action is disfavored, *e.g.*, *Johnson v. Pearce*, 313 So.2d 812, 816 (La. 1975). To prevail on a claim of malicious prosecution, a

plaintiff must prove six elements: "(1) the commencement or continuance of an original criminal proceeding; (2) its legal causation by the present defendant against plaintiff who was defendant in the proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damages conforming to legal standards resulting to plaintiff." *Miller v. E. Baton Rouge Parish Sheriff's Dep't.*, 511 So.2d 446, 452 (La. 1987).

Though not mentioned in any of the briefs submitted by the parties, it is also a longstanding rule of law in Louisiana that a defendant may not be liable for malicious prosecution if he filed charges against the plaintiff upon the advice of counsel after disclosing all relevant facts to the attorney. *See Jones*, 448 So.2d at 1272; *Johnson*, 313 So.2d at 816; *Eusant v. Unity Indus. Life Ins. & Sick Benefits Ass'n of New Orleans*, 196 So. 554, 556 (La. 1940); *see also Costello v. Hardy*, 864 So.2d 129, 144-45 (La. 2004). The Louisiana Supreme Court has styled this defense as a form of qualified immunity, *see Jones*, 448 So.2d at 1272, and while its rationale seems to have been left unarticulated, it is apparent that this rule is meant to foster, and protect, open and candid communication between clients and their attorneys.

In this case, Congress Square and Mr. Polk dispute the presence of virtually all of the elements of the tort.[4] Ultimately, however, it is clear that Mr. Polk cannot establish the third element of the claim -- that there was a "bona fide termination in favor of the present plaintiff" of the criminal proceeding. *Miller*, 511 So.2d at 452. The parties do not dispute the essential fact

---

[4] The parties do not dispute the presence of the first element of the tort -- it is uncontested that Mr. Polk was arrested for criminal trespass on October 21, 2009 and that a charge against him was filed in New Orleans Municipal Court the next day. *See* Def.'s Ex. L & M (Rec. Doc. No. 55-1).

that is determinative of this issue: the charge of criminal trespass was dismissed by the city attorney prior to trial, and thus, the case was not brought to a conclusion on the merits. *See* Def.'s Ex. M (Rec. Doc. No. 55-1). But the parties, citing conflicting opinions of the Louisiana Courts of Appeal, dispute whether such a dismissal constitute a bona fide termination for the purpose of the tort. *Compare Terro v. Chamblee*, 663 So.2d 75, 77 (La. Ct. App. 3d Cir. 1995) (noting that a termination without the determination of the merits is not a bona fide termination), *with Watson v. Church's Fried Chicken, Inc.*, 527 So.2d 979, 981 (La. Ct. App. 4th Cir. 1988) (on rehearing) (holding that a termination upon the dismissal of charges prior to the trial on the merits is a bona fide termination).

The issue is resolved, however, in light of the Louisiana Supreme Court's decision in *Savoie v. Rubin*, 820 So.2d 486 (La. 2002). In that case, the court explained that "[t]he obvious purpose of the 'bona fide termination' requirement in malicious prosecution cases is that the underlying litigation should be brought to a conclusion on the merits . . . ." *Id.* at 488. In other words, the court indicated, "this requirement is not satisfied when the merits of the underlying proceeding have not been reached." *Id.* (citing *Irby v. Harrell*, 74 So. 163 (La. 1917)). In light of this rule, the court in *Savoie* held that a dismissal of the underlying suit for improper venue did not constitute a bona fide termination. *Id.* at 489. Recently, in *Deville v. Marcantel*, 567 F.3d 156, 173 (5th Cir. 2009), the Fifth Circuit applied the rule announced in *Savoie* and held that where the district attorney obtained the dismissal of criminal charges prior to trial on the merits, there was also no bona fide termination of the underlying proceeding, *id.* at 173.

The rule articulated by the Louisiana Supreme Court thus resolves the debate that had taken place among the Louisiana Courts of Appeal. It is true that the court has thereby set up a

14

relatively high bar for claims of malicious prosecution. *Compare Savoie*, 820 So.2d at 488

(holding that bona fide termination requires adjudication of merits), *with* Restatement (Second)

of Torts § 659(c) (1977) (providing that "the formal abandonment of the proceedings by the

public prosecutor" generally constitutes a termination in favor of the accused sufficient to sustain

a claim of malicious prosecution). It reflects, however, the Louisiana Supreme Court's "guarded

. . . attitude surrounding the action for malicious prosecution," *Robinson v. Goudchaux's*, 307

So.2d 287, 291 (La. 1975), and the court's determination that the "public policy . . . that all

persons have the right to resort to the courts for redress of [alleged] wrongs," *Hibernia Nat'l*

*Bank of New Orleans v. Bolleter*, 390 So.2d 842, 844 (La. 1980), is best balanced against "[t]he

individual interest in freedom from unjustifiable litigation," *Miller*, 511 So.2d at 452, by

requiring a showing that the underlying claim was, in fact, without merit.

 As noted above, it is undisputed in this case that the charge against Mr. Polk was

dismissed by the city attorney prior to the trial on the merits. In light of the Louisiana Supreme

Court's decision in *Savoie* and the Fifth Circuit's decision in *Deville*, it is apparent that this

precludes a finding in this case that there was a bona fide termination of the criminal proceeding.

Accordingly, Congress Square's motion for partial summary judgment as to Mr. Polk's claim of

malicious prosecution must be granted.

### D. Mr. Polk's Third-Party Claims Against Ms. Peters

 In his Third-Party Complaint, Mr. Polk asserted four claims against Ms. Peters: negligent

infliction of emotional distress, intentional infliction of emotional distress, malicious

prosecution, and intentional interference with a contractual relationship. His Complaint indicates

that there are several alleged actions that underlie these claims. The first is the alleged decision

of Ms. Peters to write a letter to Mr. Polk to inform him that the managerial consultant agreement was terminated and that his future presence at the complex would be considered criminal trespass. *See* Third-Party Compl. para. 16 (Rec. Doc. No. 18). The second is the alleged delay in the sending of the letter, which was dated October 16, 2009, but not sent until October 22, 2009. *Id.* para. 21. The third is Ms. Peters's alleged advice to Mr. Wilkerson on October 21, 2009 that Mr. Wilkerson contact the police in light of Mr. Polk's presence at the apartment complex. *See id.* It is undisputed that Ms. Peters undertook all of these actions in her capacity as an attorney. Ms. Peters has now moved for summary judgment on all of these claims.

**1. Negligence Claim**

The Louisiana Supreme Court has narrowly defined the circumstances in which an attorney may be sued by her client's adversary for actions that were allegedly tortious but that the attorney undertook on behalf of her client. Indeed, the court has held that claims of negligence are not actionable at all. *See Montalvo v. Sondes*, 637 So.2d 127, 130 (La. 1994) (citing *Penalber v. Blount*, 550 So.2d 577, 581 (La. 1989)). Instead, an attorney may be liable only for acts of intentional torts against a non-client. *Id.*; *see also Penalber*, 550 So.2d at 582 ("Intentionally tortious actions, ostensibly performed for a client's benefit, will not shroud an attorney with immunity."). "The intent of this rule is . . . to prevent a chilling effect on the adversarial practice of law and to prevent a division of loyalty owed to a client." *Montalvo*, 637 So.2d at 130.

In this case, Mr. Polk alleged in his Third-Party Complaint that Ms. Peters negligently inflicted emotional distress upon him. The Louisiana Supreme Court has recognized that an individual may recover for the negligent infliction of emotional distress in certain "special circumstances." *See Bonnette v. Conoco, Inc.*, 837 So.2d 1219, 1234 (La. 2003) (quoting *Moresi*

*v. State Through Dep't of Wildlife & Fisheries*, 567 So.2d 1081, 1096 (La. 1990)). As noted

above, however, it is undisputed that the actions of Ms. Peters that underlie Mr. Polk's claim of

negligent infliction of emotional distress were all undertaken by Ms. Peters in her capacity as an

attorney. Because "[a]n attorney does not owe a legal duty to his client's adversary when acting

in his client's behalf, absent a showing of intentionally tortious conduct on the attorney's part,"

*Crockett v. Crockett*, 612 So.2d 89, 89 (La. 1993), Mr. Polk's claim of negligence fails as a

matter of law. In response to Ms. Peters's motion for summary judgment as to this claim, Mr.

Polk concedes that his claim is without merit. Accordingly, Ms. Peters's motion for summary

judgment with respect to this claim must be granted.

**2. Intentional Torts**

      Mr. Polk has alleged that Ms. Peters committed three intentional torts against him:

intentional infliction of emotional distress, malicious prosecution, and intentional interference

with a contractual relationship. All three claims fail as a matter of law.

      **a. Intentional Infliction of Emotional Distress (IIED)**

      In her motion for summary judgment, Ms. Peters argues in part that Mr. Polk's IIED

claim must be denied because emotional distress is an element of damages that could be

recovered under his claim of malicious prosecution. This argument is not persuasive. For this

proposition, Ms. Peters cites to *Brown v. Menszer*, No. 99-790, 2000 WL 1210824, at *5 (E.D.

La. 2000), and *Jenkins v. Baldwin*, 801 So.2d 485, 500-01 (La. Ct. App. 4th Cir. 2001). The only

case that these two decisions, in turn, cite is *Kelly v. West Cash & Carry Bldg. Materials Store*,

745 So.2d 743 (La. Ct. App. 4th Cir. 1999), which Ms. Peters also cites. In *Kelly*, however, the

court cited no authority when it concluded that a claim of emotional distress was properly

dismissed prior to trial merely because emotional distress could be recovered under the other causes of actions asserted by the plaintiff. *See id.* at 760.

This reasoning seems anomalous and appears to find no support in other cases. For instance, the courts have examined the merits of claims of negligent infliction of emotional distress and IIED separately when both are presented on motions for summary judgment. *See, e.g.*, *Lester v. Sec'y of Veterans Affairs*, 514 F. Supp. 2d 866, 881-82 (W.D. La. 2007); *Barrino v. E. Baton Rouge Parish Sch. Bd.*, 697 So.2d 27, 31-32, 33-34 (La. Ct. App. 1st Cir. 1997). Similarly, the courts have separately examined the merits of claims of malicious prosecution and IIED on motions for summary judgment. *See, e.g.*, *Cook v. Am. Gateway Bank*, 49 So.3d 23, 36, 37 (La. Ct. App. 1st Cir. 2010). To be sure, the situation would be different if the plaintiff prevails at trial on the claim of IIED and the claim of malicious prosecution. In that circumstance, "the well-settled premise that Louisiana law does not allow for double recovery of the same element of damages" would be implicated, *Albert v. Farm Bureau Ins. Co.*, 940 So.2d 620, 622 (La. 2006), and the plaintiff would not be allowed to obtain double recovery for her emotional distress, *see id.*[5]

This is not the case here, however, and the jurisprudence reveals no reason why the mere fact that the plaintiff has asserted a claim of malicious prosecution -- and thus the mere possibility that a plaintiff *could* prevail on such a claim at trial -- require *ipso facto* that the IIED claim be dismissed before trial, regardless of whether the plaintiff has produced sufficient evidence for a jury to find for the plaintiff on that claim. Accordingly, although Mr. Polk does

---

[5] The decision in *Kelly* seems to misapprehend the rule against double recovery, and it seems to suggest that a plaintiff cannot set forth alternative theories of recovery for the same allegedly wrongful act.

18

not object to the argument advanced by Ms. Peters, it is not a proper basis upon which this Court may grant Ms. Peters's motion for summary judgment. *See* Fed. R. Civ. P. 56(a) & advisory committee notes (providing that summary judgment should be granted only if "the movant is entitled to judgment as a matter of law" and noting that "summary judgment cannot be granted by default even if there is a complete failure to respond to the motion"). The Court therefore takes the further step of analyzing whether Mr. Polk's IIED claim can survive Ms. Peters's motion for summary judgment in light of the applicable substantive law and the evidence adduced thus far.

The answer to this question is no. In *Penalber*, the Louisiana Supreme Court suggested that a plaintiff-nonclient who asserts a claim of intentional tort against a defendant-attorney need only show that the defendant-attorney had the sort of intent that is generally required of intentional torts. *See Penalber*, 550 So.2d at 582. In other words, the court suggested that a plaintiff-nonclient does not have to show "a hostile intent, or a desire to do any harm" on the part of the defendant-attorney. *Id.* (quoting *Caudle v. Betts*, 512 So.2d 389, 391 (La. 1987)). Rather, under *Penalber*, the plaintiff-nonclient only has to prove that the defendant-attorney had "an intent to bring about [the] result which will invade the interests of another in a way that the law forbids. The defendant may be liable although . . . honestly believing that the act would not injure the plaintiff . . . ." *Id.* (quoting *Caudle*, 512 So.2d at 391).

More recently, however, the Louisiana Supreme Court has concluded that "specific malice or an intent to harm" must be shown. *Montalvo*, 637 So.2d at 130. The reason for this shift is apparent. As the court recognized, an attorney oftentimes is simply "the instrument through which the client" seeks to secure his rights. *Id.* Thus, the requirement that a plaintiff-

19

nonclient show that a defendant-attorney merely intended the result that flowed from her action, or knew that a result would follow from her action, would raise the specter of liability on those actions that an attorney takes simply to advance the interests of her client. This would, of course, have a "chilling effect" on an attorney's willingness to act on behalf of a client and thus work to the detriment of our system of adversarial advocacy. *See id.* Accordingly, the Louisiana Supreme Court has indicated that to hold a defendant-attorney liable for an action undertaken in her capacity as an attorney, a plaintiff-nonclient must prove "specific malice or an intent to harm on the part of the attorney." *Id.*[6]

The Louisiana Supreme Court's conclusion corresponds to the prevailing view on this subject. The Third Restatement of the Law Governing Lawyers states, for instance, that an attorney may be liable for malicious prosecution only if the plaintiff shows that the attorney acted "primarily for a purpose other than bringing an offender to justice or assisting a client to assert the client's rights." Restatement (Third) of Law Governing Lawyers § 57 cmt. e (2000). Similarly, the Restatement notes that an attorney may not be liable for advising a client to breach a contract if she "acts or advises with the purpose of promoting the client's welfare." *Id.* cmt. g. The Louisiana Supreme Court has thus aligned itself with the view that in order to prevail on a

---

[6] Although *Montalvo* involved one particular intentional tort, the reasoning of the Louisiana Supreme Court in that case compels the conclusion that the heightened requirement of intent applies to all claims of intentional tort asserted by a nonclient against an attorney. For instance, with respect to a claim of IIED, it can fairly be said that an attorney who files a petition for divorce knows that emotional distress is certain to result from that action. Under the view that is apparently advanced by Mr. Polk, such an attorney would be liable for IIED. This result is clearly inconsistent with the Louisiana Supreme Court's concern about the "chilling effect on the adversarial practice of law" that may be created by tort liability. *Montalvo*, 637 So.2d at 130. Thus, the heightened intent requirement articulated in *Montalvo* logically extends to all claims of intentional tort asserted against an attorney by a nonclient, including a claim of IIED.

claim of intentional tort against an adversary's attorney, the plaintiff-nonclient must not only show the otherwise generally applicable elements of the tort, but also demonstrate that the defendant-attorney had "a desire to harm which is independent of the desire to protect [her] client." *E.g.*, *Fraidin v. Weitzman*, 611 A.2d 1046, 1080 (Md. Ct. Spec. App. 1992). The decisions of the Louisiana Supreme Court indicate that society's fundamental interest in a robust system of adversarial advocacy not only sets up an absolute bar against claims of negligence, but also requires a heightened showing of intent with respect to intentional torts.

In general, a claim of IIED under Louisiana law requires the showing "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." *King v. Phelps Dunbar, LLP*, 743 So.2d 181, 185 (La. 1999) (quoting *White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La. 1991)). As noted above, the actions of Ms. Peters that underlie Mr. Polk's IIED claim were all undertaken by Ms. Peters in her capacity as an attorney. In light of *Montalvo*, it is therefore not enough for Mr. Polk to show that Ms. Peters knew that severe emotional distress would result from her actions. *See Montalvo*, 637 So.2d at 130. Rather, he must show that she wrote the letter advising him of the termination of the agreement, delayed sending the letter until after the inspection on October 21, 2009, and advised Mr. Wilkerson to contact the police with the "desire[] to inflict severe emotional distress," one that was independent of her desire to act on behalf of her client. *White*, 585 So.2d at 1209. Only this would establish the requisite "specific malice or [] intent to harm." *Montalvo*, 637 So.2d at 130.

A review of the summary judgment record indicates that Mr. Polk has not adduced

21

evidence that, even when viewed in the light most favorable to him, could reasonably support the inference that Ms. Peters had such an intent. First, it is true that according to the undisputed evidence, Ms. Peters wrote a letter to Mr. Polk on October 16, 2009 in order to inform him of the dissolution of the agreement and of Congress Square's intent to consider his future presence at the complex as criminal trespass. *See* Third-Party Def.'s Ex. 9 (Rec. Doc. No. 51-3). Ms. Peters's deposition testimony indicates, however, that she wrote the letter because she concluded that the agreement that is at issue contemplated an employment relationship that could be dissolved under the circumstances. *See* Third-Party Def.'s Ex. 8 (Rec. Doc. No. 51-3). She also testified that she reached this conclusion based upon her review of the relevant documents and the facts that Mr. Wilkerson conveyed to her. *Id.* She further testified that Mr. Wilkerson instructed her to write the letter rather than initiate legal action. *Id.* Mr. Polk points to no evidence that Ms. Peters wrote the letter with an independent desire to inflict emotional distress on Mr. Polk, and a review of the record reveals none.

Second, it is also true that there is uncontroverted evidence that the October 16, 2009 letter was not mailed until October 22, 2009, *see* Def.'s Ex. I (Rec. Doc. No. 64-1), and that on October 21, 2009, Ms. Peters advised Mr. Wilkerson to contact the police after Mr. Wilkerson informed her of Mr. Polk's presence at the apartment complex and asked for her advice, *see, e.g.*, Third-Party Def.'s Ex. 8 (Rec. Doc. No. 51-3). The record is devoid of evidence that would support the inference, however, that Ms. Peters deliberately withheld the letter to induce Mr. Polk to go to the property in order to effectuate an arrest and to thereby inflict emotional distress upon him.

During her deposition, Ms. Peters testified that after she wrote the letter on October 16,

2009, she instructed her staff to have it mailed. *See id.* According to Ms. Peters, she later on checked with her staff to see if the letter had been mailed, and she was given an affirmative answer. *See id.* Mr. Polk has neither cited nor provided any evidence that would suggest anything to the contrary. Similarly, he has neither cited nor provided any evidence that would otherwise undercut the credibility of Ms. Peters's testimony. Thus, the uncontroverted evidence in this case is that Ms. Peters neither knew that the letter had not been mailed nor deliberately withheld the letter. Mr. Polk's allegation in his brief that Ms. Peters "knew that she had not mailed the letter," Def.'s Opp. Mem. at 5 (Rec. Doc. No. 64), finds no support in the record.

In addition, Ms. Peters testified during her deposition that she advised Mr. Wilkerson to call the police only after she was contacted by Mr. Wilkerson by phone. Third-Party Def.'s Ex. 8 (Rec. Doc. No. 51-3). Her uncontroverted testimony reveals that she did so after Mr. Wilkerson informed her that Mr. Polk had come to the property, that he had someone present Mr. Polk with a copy of her October 16, 2009 letter, and that he learned later on that Mr. Polk was still on the property. *Id.*; *see also* Third-Party Def.'s Ex. 11 (Rec. Doc. No. 51-3). Again, Mr. Polk points to no evidence that Ms. Peters advised Mr. Wilkerson to call the police with an independent desire to inflict emotional distress on Mr. Polk, and a review of the record reveals none.

It is true that it is unlikely that a person would admit to the fact that she took an action with a desire to harm another person. Thus, the presence of such an intent is generally inferred from circumstantial evidence. Such evidence, in this case, could have consisted of evidence of prior conflicts between Ms. Peters and Mr. Polk. No such evidence has been adduced, however. In fact, during his deposition, Mr. Polk conceded that he has never met Ms. Peters in person, that he has no idea what she looks like, that he has never spoken to her on the phone, and that he has

23

never emailed her. Third-Party Def.'s Ex. 10 (Rec. Doc. No. 51-3); *see also* Third-Party Def.'s Ex. 14 (Rec. Doc. No. 51-3).

Similarly, there is no evidence suggesting that Ms. Peters has prior dealings with Mr. Wilkerson or otherwise has any reason or disposition that would lead her to harbor an independent desire to harm Mr. Polk. The uncontroverted evidence in this case shows that Ms. Peters was an associate at the Law Office of Bernard L. Charbonnet, Jr. at the relevant time and that she was retained as counsel only because Mr. Wilkerson had contacted a friend of Mr. Charbonnet, who, in turn, asked Ms. Peters to take on the matter. *See* Third-Party Def.'s Ex. 8 (Rec. Doc. No. 51-3). Ms. Peters first met with Mr. Wilkerson only in late August or early September 2009. *Id.* Prior to that initial consultation, Ms. Peters did not know Mr. Wilkerson. *Id.*

In sum, there is no circumstantial evidence in this case from which one could possibly, let alone reasonably, infer that Ms. Peters had an intent to inflict emotional distress on Mr. Polk, one that was independent of her intent to act on behalf of Mr. Wilkerson. In light of the record, Mr. Polk's strenuous insistence that Ms. Peters engaged in "a pattern of intentionally deceptive behavior," Def.'s Opp. Mem. at 16 (Rec. Doc. No. 64), and that she undertook a "plot" to set up a "trap" for him, *id.* at 16, 18, is an assertion that, at the very best, rests upon "only a 'scintilla' of evidence" and thus cannot survive a motion for summary judgment. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994) (en banc) (quoting *Davis v. Chevron USA, Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994))

To be sure, this Court has recognized that as a general matter, summary judgment is rarely appropriate in cases where intent is at issue. *See, e.g.*, *Riverbend Capital, LLC v. Essex Ins. Co.*, No. 09-3599, 2010 WL 3942907, at *7 (E.D. La. 2010). Indeed, "a determination of

24

someone's state of mind usually entails the drawing of factual inferences as to which reasonable people might differ." 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2730 (3d ed. 2004). For a reasonable inference to be drawn, however, the summary judgment record must contain some sort of evidentiary basis to support the inference. This is an unusual case where the record is wholly devoid of such a basis. In sum, because there is no evidence that could reasonably support the inference that Ms. Peters had an independent desire to inflict emotional distress upon Mr. Polk when she acted on behalf of Mr. Wilkerson, summary judgment as to Mr. Polk's claim of intentional infliction of emotional distress must be granted.

**b. Malicious Prosecution**

As discussed above, an element of the tort of malicious prosecution is the bona fide termination in favor of the present plaintiff of the underlying criminal proceeding, *see, e.g.*, *Miller*, 511 So.2d at 452, and the Louisiana Supreme Court has held that "this requirement is not satisfied when the merits of the underlying proceeding have not been reached," *Savoie*, 820 So.2d at 488. Here, it is undisputed that the charge of criminal trespass was dismissed prior to trial on the merits. Mr. Polk therefore cannot establish one essential element of the tort. *See Deville*, 567 F.3d at 173. For this reason alone, Ms. Peters's motion for summary judgment as to this claim must be granted.

In addition, as noted above, Mr. Polk has not adduced evidence that would reasonably support that Ms. Peters had an independent intent to harm him when she advised Mr. Wilkerson to contact the police on October 21, 2009. *See Montalvo*, 637 So.2d at 130 (noting that a plaintiff-nonclient must prove "specific malice or an intent to harm on the part of the attorney"); *see also* Restatement (Third) of Law Governing Lawyers § 57 cmt. e (noting that the plaintiff-

nonclient must show that the attorney acted "primarily for a purpose other than bringing an offender to justice or assisting a client to assert the client's rights"). Thus, Mr. Polk cannot show that Ms. Peters had the requisite intent in order for him to prevail on this claim of intentional tort. For this additional reason, Ms. Peters's motion as to this claim must also be granted.

### c. Intentional Interference with a Contractual Relationship

In *9 to 5 Fashions, Inc. v. Spurney*, 538 So.2d 228 (La. 1989), the Louisiana Supreme Court overruled its prior decision in *Kline v. Eubanks*, 33 So. 211 (La. 1902), and recognized a limited form of the tort of intentional interference with a contract. *9 to 5 Fashions*, 538 So.2d at 234. The court held that a corporate officer may be liable for tortiously interfering with a contract between his employer and a third party. *See id.* The court expressly noted the limited nature of its holding, stating that "[s]ome aspects of this tort have been subjected to serious criticisms." *Id.* Since then, the court has reaffirmed the "narrowly drawn action" that it has recognized, *Great Sw. Fire Ins. Co. v. CNA Ins. Companies*, 557 So.2d 966, 969 (La. 1990); *see also Cowen v. Steiner*, 701 So.2d 140, 140 (La. 1997), *rev'g* 689 So.2d 516 (La. Ct. App. 3d Cir. 1997) (reversing the lower court's attempt at expanding the tort), and courts applying Louisiana law have generally concluded that it would be improper to extend the tort beyond the facts of *9 to 5 Fashions*, *see, e.g.*, *Healthcare Mgmt. Servs., Inc. v. Vantage Healthplan, Inc.*, 748 So.2d 580, 583 (La. Ct. App. 2d Cir. 1999); *see also Spears v. Am. Legion Hosp.*, 780 So.2d 493, 498 (La. Ct. App. 3d Cir. 2001).

In his opposition to Ms. Peters's motion, Mr. Polk asserts, without providing any citation to any authority, that an attorney may under Louisiana law be held liable for tortiously precipitating the dissolution of a contract between a client and a third party. Research reveals no

case in which the Louisiana Supreme Court has endorsed such a proposition, however. It remains the case that "[t]he cause of action for intentional interference with a contract has been very limited in its application," *Mor-Tem Risk Mgmt. Servs., Inc. v. Shore*, 978 So.2d 588, 593 (La. Ct. App. 2d Cir. 2008). And in this case, the tort is plainly unavailable.

Even if one were to assume *arguendo* that the tort identified by Mr. Polk is cognizable, the evidence adduced thus far does not provide a reasonable basis upon which to find that Ms. Peters had an intent to injure Mr. Polk that was independent of her desire to advance the interests of her client. As noted above, Mr. Polk cannot show that Ms. Peters advised Mr. Wilkerson that he could or should terminate the agreement, and that she wrote the letter informing Mr. Polk of the dissolution, with "an intent to harm" Mr. Polk. *See Montalvo*, 637 So.2d at 130 (noting that a plaintiff-nonclient must prove "specific malice or an intent to harm on the part of the attorney"); *see also* Restatement (Third) of Law Governing Lawyers § 57 cmt. g (noting that an attorney may not be liable for advising a client to breach a contract if she "acts or advises with the purpose of promoting the client's welfare."). Accordingly, Ms. Peters's motion for summary judgment as to this claim must also be granted.

## IV. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Congress Square's Motion for Partial Summary Judgment on Mr. Polk's counterclaim for attorney's fees under the open account statute (Rec. Doc. No. 44) is hereby **GRANTED** and that the counterclaim for attorney's fees under the open account statute is hereby **DISMISSED** with prejudice.

**IT IS FURTHER ORDERED** that Congress Square's Motion for Partial Summary Judgment on Mr. Polk's counterclaim for malicious prosecution (Rec. Doc. No. 48) is hereby

**GRANTED** and that the counterclaim for malicious prosecution is hereby **DISMISSED** with prejudice.

    **IT IS FURTHER ORDERED** that Ms. Peters's Motion for Summary Judgment on Mr. Polk's third-party claims (Rec. Doc. No. 51) is hereby **GRANTED** and that Mr. Polk's third-party claims against Ms. Peters are hereby **DISMISSED** with prejudice.

    New Orleans, Louisiana, this 4th day of March, 2011.


                                        _____
                                        UNITED STATES DISTRICT JUDGE